Marvin Edwin **WHITEMAN,** Appellant,

v.

**L. G. MATHEWS,** Appellee.

No. 13725.

United States Court of Appeals

Ninth Circuit.

Nov. 9, 1954.

Lyon & Lyon, Richard F. Lyon, Los Angeles, Cal., for appellant.

Mason & Graham, Collins Mason, Max Tendler, Olin N. MacKay, Los Angeles, Cal., for appellee.

Before STEPHENS and CHAMBERS, Circuit Judges, and WALSH, District Judge.

WALSH, District Judge.

Appellant (hereinafter Whiteman) is the owner of United States Letters Patent No. 2,198,929, issued April 30, 1940, on application filed May 3, 1939, for a Cement Floor Finisher. The machine of the patent is described briefly as follows: Trowels or blades extending substantially radially to a vertical shaft are rotated by means of a motor geared to the upper end of the shaft. At the lower end of the shaft is attached a plate

to which the blades or trowels are connected by means of pins. The plate and the trowels are rotated by the action of the motor on the shaft through reduction gears, and the contact of the rotating trowels on the cement surface accomplishes the finishing process. While in operation the weight of the machine is entirely supported by the trowels.

In order that the trowels may be adjusted to the pitch or tilt which is suitable to the texture or consistency of the particular surface being finished, each trowel is so mounted that it may be turned to an angle relative to the surface acted upon. On each trowel itself there is a small arm or pin which attaches to one end of a crank-arm; and the other end of the crank-arm is in contact with a thrust-collar. The thrust-collar is on the motor-driven shaft and can be raised or lowered on the shaft by turning a knob which is located on the handle of the machine and is connected by a control mechanism to the thrust-collar. The raising or lowering of the thrust-collar

can be accomplished either while the machine is in operation or while it is stationary. When the trust-collar is raised or lowered it simultaneously varies the tilt of all the trowels; and the tilt to which the trowels are moved is maintained so long as the control knob remains in the position to which adjusted.

Whiteman brought suit below charging appellee (hereinafter Mathews) with infringement of his patent and praying for an injunction and damages. Mathews' answer denied infringement and asserted the invalidity of the patent. At pre-trial conference, Whiteman specified claims 1 to 7, inclusive,[1] as being those relied upon in his infringement claim, and thereafter the suit proceeded to trial before the court without a jury. The trial court held the claims invalid for lack of invention and, consequently, did not determine the question of infringement. On this appeal, Whiteman attacks the crucial Findings of Fact[2] made by the trial court as unsupported

1. Claim 5 is typical and reads as follows:

"5. A cement floor finisher comprising a vertical shaft, means for rotating said shaft, a plurality of trowels radially arranged with respect to the shaft and adapted to be rotated thereby, each trowel being tiltably mounted, a thrust collar on the shaft, arms on the trowels actuated by the thrust collar, and means for varying the position of the thrust collar on the shaft whereby the tilt of the trowels may be varied."

2. Findings of Fact, No. 6 through No. 9, reading:

"6. Plaintiff concedes that all of the parts of the assemblies specified in claims 1–7, inclusive, of said patent in suit No. 2,198,929, are individually old, and the evidence establishes that, prior to the time plaintiff Whiteman claims to have devised his said cement floor finisher described and claimed in said patent, assemblies including a plurality of trowels radially arranged around and tiltably mounted upon a motor-driven hub or carrier were well known in prior art for use in finishing cement floors, and that the thrust collar, when brought into association with any form of machinery having tiltable blades, was a well known device

for use in tilting blades in motion and holding them tilted. Also, as early as 1871, it was old to use a thrust collar to change the angle of power-driven blades or arms in street sweepers.

"7. Each of the elements specified in each of claims 1–7, inclusive, of said patent in suit No. 2,198,929 performs nothing more than its normal, well known and expected function, and performs that function in its normal, well known and expected manner, and no unexpected or added result was brought about by combining those parts into the assembly disclosed in the patent in suit.

"8. Any skilled mechanic, when faced with the problem of changing the pitch of blades, in any machine having tiltable blades, would immediately employ the well known thrust collar for the purpose without exercising anything more than the skill of his calling. At the time patentee Whiteman devised his floor finisher, it would have been obvious to any person having ordinary skill in the art to which the patent in suit pertains to do what patentee Whiteman did.

"9. Claims 1–7, inclusive, of United States Letters Patent in suit No. 2,198,929 involve nothing more than mere mechanical skill."

by substantial evidence and clearly erroneous.

In sum, the Findings of Fact under attack amount to two basic determinations by the trial court, viz.: (1) that previous to the Whiteman patent there existed in the cement finishing art a machine or machines disclosing all of the elements of the Whiteman patent except the thrust-collar for changing the pitch of the trowels while in motion; and (2) that the addition to the pre-existing machine or machines of the thrust-collar for changing the pitch of the trowels while in motion involved no more than the exercise of the ingenuity to be expected of a mechanic skilled in the art. Our decision in this case depends upon the resolution of the question of whether or not the evidence supports these two determinations.

At the trial, Mathews introduced into evidence two patents, Boulton No. 2,101,-895, issued December 14, 1937, and Leistner No. 2,181,375, issued November 28, 1939, together with evidence regarding the construction and use in the Los Angeles area during the period 1936–1941 of cement finishing machines of a type styled "the Spencer machine". The Boulton patent is for a "Machine for Troweling" and the Leistner patent is for a "Finishing Device for Cement Surfaces". The evidence relating to the Spencer machine consisted of a physical exhibit identified as the first of such machines constructed, the testimony of its creator, John Spencer, and the testimony of an operator of the machine, Charles Solenski. Support for the finding below of the existence of a machine disclosing the elements of the Whiteman patent, absent the thrust-collar, must be found, if it is to be found at all, in the foregoing evidence.

Both the Boulton and Leistner patents, like Whiteman's, show machines for troweling cement surfaces, composed of a motor rotating a vertical shaft at the end of which shaft are placed a plurality of trowels, each tiltably mounted, radially arranged with respect to the shaft and adapted to be rotated thereby. Whiteman contends, however, that study of the machines of Boulton and Leistner discloses that they lack important elements of the Whiteman machine and, accordingly, furnish no basis for the finding of the trial court.

In analyzing the Boulton patent, Whiteman first divides the work of cement troweling into the "floating" operation and the "finishing" operation,[3] and then asserts that the design and purpose of the Boulton machine are for "floating" cement surfaces and that it is not, as Whiteman is, a machine for "finishing" cement surfaces. Indeed, Whiteman's contention is very much broader, because he argues that prior to the Whiteman patent there was *no* machine designed or constructed for finishing cement. The merit of this contention is opened to question when it is observed that in his application for his patent he stated that machines had theretofore been devised for finishing cement surfaces but asserted that they had been unsuccessful because the machine driven trowels were either incapable of being tilted with respect to the surface of the cement or, if given a tilt, the degree of tilt of the trowels could not be varied while the machine was in operation. Apart from this tacit admission that some machines for finishing cement had

3. When the concrete has been poured and leveled and has partially set, troweling is done with the bottom surface of the trowel maintained flat and level with the surface acted upon. This is the "floating" operation. Its purpose is to work the larger aggregate down and to bring the cement and fine sand to the surface; and its result is to produce a rough surface. The "finishing" operation then begins, and in this process the trowels are held at a tilt, the angle of the tilt depending upon the hardness of the concrete. The proper angle or tilt to be applied to the trowel in "finishing" requires considerable skill, as it must be varied with the consistency of the surface being treated, the water content of the concrete, and the extent to which the concrete has set.

been devised prior to Whiteman, in the trial of the case Whiteman's counsel several times conceded that all of the elements of the Whiteman patent were old and, indeed, that the invention in the Whiteman machine consisted of the ability to adjust the trowels while the machine was in operation. In this latter regard, the record shows this passage between the court and Whiteman's counsel:

"The Court: While we have a moment of interruption, Mr. Miller, do you want to tell me where the flash of genius is in this case, that which the books describe as 'flash of genius', that makes this invention rather than application of mechanical skill? * * *

"Mr. Miller: I don't know how to go into that without going into an extended argument; but in a ten-second statement it is on this: It is the ability to adjust these trowels while the machine is in operation and it is the tiltable-in-motion principle. That is brand new in this art."

As to both Boulton and Leistner, Whiteman stresses what he regards as a major variation in these machines from his patent, claiming that while the trowels in both Boulton and Leistner are tiltably mounted, and while the claims of the Whiteman patent describe its trowels as tiltably mounted, the drawings and specifications of the Whiteman patent disclose its trowels to be actually rotably or pivotally mounted.[4] He cites the principle, and we agree, that the claims of a patent must be contrued in the light of the specifications and draw-

ings, Payne Furnace & Supply Co. v. Williams, 9 Cir., 117 F.2d 823, Himes v. Chadwick, 9 Cir., 199 F.2d 100; but we add that the claims are to be interpreted, not only in the light of the specifications and drawings, but also with reference to the file wrapper history. Whitman v. Andrus, 6 Cir., 194 F.2d 270, 275, Mas v. Owens-Illinois Glass Co., D.C.N.J., 122 F.Supp. 582, 583. The file wrapper of the Whiteman patent shows that the original claims 1 to 5 were rejected, on the Boulton patent, because the trowels in Boulton were tiltable; and further, that claim 1, as amended, was withdrawn after it had been rejected because Leistner substantially read thereon, in that Leistner had tilted blades, held in tilted position by means of pins and a spring plate. With the matter of the mounting of the trowels thus forcibly drawn to his attention, Whiteman amended his claims to include means of holding the trowels in their tilted positions; but at no time in the Patent Office proceedings did he claim rotable or pivotal mounting of the trowels. If it were necessary to decide it, we might have some difficulty with the question whether Whiteman is estopped to raise the issue of tiltable as opposed to rotable or pivotal mounting of trowels.

However, the finding with which we are immediately concerned does not rest alone on the Boulton and Leistner patents in evidence. Whiteman concedes that the Spencer machine, Defendant's Exhibit H, discloses all of the elements of the patent in suit except the thrust-collar for changing the tilt of the trowels in motion; and it follows that if the

---

4. Whiteman makes the additional contention as to Leistner that while it is a machine for finishing cement, it is not in the prior art. He points out that while the Leistner patent was issued earlier than his own, he introduced evidence below consisting of a documentary exhibit and testimony by himself and his former wife to establish that he conceived his invention as early as May, 1937, and actually built his first machine in January, 1938, both events antedating the Leistner application which was filed June 10,

1938. Obviously the argument that Leistner is not in the prior art is bottomed upon an assumption that the trial court accepted this evidence as true and found the facts in accordance with it. But the contrary is evidently the case, since the trial court expressly refused to find that Whiteman conceived of the device disclosed in his patent on or about May 15, 1937, and that he reduced his invention to practice during the month of January, 1938. Plaintiff's Proposed Finding of Fact No. VI, R. 30.

Spencer machine is in the prior art, the finding of the trial court must be upheld. But Whiteman insists that the evidence adduced to establish that the Spencer machine was constructed early enough to constitute prior art with respect to the patent in suit fails to support the burden of proof required to be met by one proposing to show prior public use. He urges that the evidence regarding the construction and use of the Spencer machine is, apart from the physical exhibit, composed only of oral testimony and that, consequently, it fails to meet the standard required as a matter of law.

■ The burden of proof imposed upon a party tendering the issue of prior public use is a heavy one. It is not satisfied by a mere preponderance of the evidence, but is borne successfully only if the evidence is clear and satisfactory—perhaps beyond a reasonable doubt. It is not the rule, however, that oral evidence is insufficient as a matter of law in all cases; nor does the rule require the trial court to discard credible testimony merely because it is oral and because it deals with events and circumstances long past. If the evidence as to prior public use is such that it would be accepted as satisfactory and convincing in any other kind of case, criminal or civil, then the degree of proof fixed by law to establish such use is attained. Radio Corp. of America v. Radio Engineering Laboratories, 293 U.S. 1, 7, 55 S.Ct. 928, 931, 79 L.Ed. 163; Paraffine Companies, Inc. v. McEverlast, Inc., 9 Cir., 84 F.2d 335, 339, 341; Rown v. Brake Testing Equipment Corp., 9 Cir., 38 F.2d 220, 224; International Carbonic Engineering Co. v. Natural Carbonic Products, Inc., D.C.Cal., 57 F.Supp. 248, 258, affirmed 9 Cir., 158 F.2d 285; Becker v. Electric Service Supplies Co., 7 Cir., 98 F.2d 366.

Spencer, who had engaged in the masonry business in the Los Angeles area both as a journeyman and contractor from 1915 until he took employment as a construction superintendent in 1941, produced Defendant's Exhibit H and identified it as having been built and used by him in 1936, the first of ten such machines built and used in the Los Angeles area between 1936 and 1941. He traced the origin of Defendant's Exhibit H from its conception as an idea through to its construction, specifying the sources of the parts which he assembled into the machine. He listed the construction jobs on which his machines were used between 1936 and 1941, and he named persons to whom he had rented or furnished machines in that period. So far as it is possible to make an appraisal from a printed record, it would appear that he was a frank and forthright witness. He was corroborated as to the existence of his machine in 1936 and as to its use in that year on a particular construction project in Los Angeles by the witness Solenski.

■ Spencer is a disinterested witness. He is corroborated by Solenski, a disinterested witness. His testimony is not improbable, and it is bulwarked by his production of Defendant's Exhibit H, the same machine which some of Whiteman's witnesses testified they saw in operation on a job in Los Angeles in the summer of 1938.[5] Spencer's testimony was not contradicted on any important point. He was not impeached in any particular whatever, notwithstanding that his testimony was detailed in many respects and notwithstanding that a recess of the trial between his direct and cross-examination allowed counsel a period of more than sixty days within which to investigate and probe into his testimony. Finally, the trial court alone had the opportunity to see and hear the witnesses testifying regarding the Spencer machine and to use that invaluable aid in judging the credibility of such witnesses and the weight which should be given to their testimony. Taking in-

5. This date is only a few months later than that fixed by Whiteman for the construction of his first machine, and it is approximately a year earlier than the date on which Whiteman filed his application for a patent.

to account all of the foregoing, we cannot say that the court below was in error in its finding of prior public use of the Spencer machine. Waterloo Register Co. v. Atherton, 9 Cir., 38 F.2d 75; Becker v. Electric Service Supplies Co., supra.

The issue remaining to be considered in the case, i. e., whether the adaptation to the pre-existing machine of the thrust-collar for changing the pitch of the trowels in motion involved more than the exercise of the skill of the calling, presents little difficulty.

██ The expert witnesses for both sides told the trial court that a thrust-collar is an old and well known mechanical expedient for changing the pitch of blades in motion; that the functions performed by a thrust-collar in changing the pitch of blades are not new or unexpected; and that, in the Whiteman patent, the thrust-collar performs only its conventional function. In addition, Whiteman's expert frankly conceded that a machinist, designer, or engineer who was presented with a device comprising rotating blades and was asked to suggest means for varying the pitch of the blades while they were in rotation, would immediately suggest a thrust-collar. On the basis of this testimony, there would seem to be no question regarding either the soundness of the trial court's finding or the propriety of its judgment holding the claims in suit invalid for want of invention. Altoona Publix Theatres v. American Tri-Ergon Corp., 294 U.S. 477, 486, 55 S.Ct. 455, 79 L.Ed. 1005; Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 90, 62 S.Ct. 37, 86 L.Ed. 58; Leishman v. General Motors Corp., 9 Cir., 191 F.2d 522; Trico Products Corp. v. Delman Corp., 8 Cir., 180 F.2d 529.

Mathews put in evidence below certain prior patents relating to fans and propellors [6] to illustrate the use of a thrust-collar to change the pitch of blades in motion, and Whiteman makes some point here that the patents are in a non-an-alogous art. Even if this is conceded, the testimony of the experts is to the effect that the functions and uses of a thrust-collar are within the field of common knowledge possessed by all skilled mechanics; and under such circumstances the disclosures of the fan and propellor arts cannot be ignored. Allied Wheel Products, Inc. v. Rude, 6 Cir., 206 F.2d 752, 756; Illinois Welding Accessories Co. v. Johnson Welding Equipment Co., 7 Cir., 161 F.2d 624, 626; In re O'Connor, 161 F.2d 221, 222, 34 C.C.P.A., Patents, 1055.

The judgment of the trial court is affirmed.

---

6. Murray No. 1,384,672 for a reversible fan; Ratier No. 1,921,942 for a metal-lic propellor; and Bender No. 1,835,372 for a propellor structure.