**METAL ARTS COMPANY, Appellant,**

v.

**FULLER COMPANY, Appellee.**

**No. 24123.**

United States Court of Appeals
Fifth Circuit.

Feb. 6, 1968.

Jefferson D. Giller, William A. Stout, Dudley R. Dobie, Jr., Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., for defendant-appellant.

James G. Ulmer, Baker, Botts, Shepherd & Coates, F. Walter Conrad, Houston, Tex., for appellee, Fuller Co.

Before BELL, COLEMAN and GODBOLD, Circuit Judges.

GRIFFIN B. BELL, Circuit Judge:

This appeal by Metal Arts Company is from a judgment holding that it had infringed appellee's patent for a low pressure pneumatic conveyor designed to solve the problem of streamer formation in the conveyance of polyethylene pellets. The patent, No. 2,784,038, was issued to appellee on March 5, 1957 on the application of George Schneider filed January 11, 1956.

Appellee Fuller Company, the plaintiff in the District Court, charged Metal Arts with infringing the two claims of the patent and sought an injunction and

an accounting. Metal Arts by way of answer and counterclaim for declaratory judgment, denied infringement and asserted the invalidity of the patent claims. After a non-jury trial on the merits, the court entered judgment for Fuller. The judgment held the patent valid; and that Metal Arts had directly and contributorily infringed, and had actively induced infringement of both claims of the patent. Metal Arts was enjoined from further infringement and damages were ordered paid for the infringement. The question as to the amount of damages to be awarded was referred to a special master. All relief prayed for by defendant was denied.

The issues presented go to validity and infringement but only in the context of whether the patent was anticipated by the prior art, 35 U.S.C.A. § 102(b); and whether there was infringement in fact of the claims of the patent in suit.[1] We affirm.

### I.

Polyethylene as a raw material for making consumer products is a relative newcomer to the American market. We are concerned with its manufacture and use in the form of pellets. As a particulate or granular material, the pellets are easily moved in a pneumatic conveyor. When polyethylene came into use on a large scale, the Dust Recovery and Conveying Co., or Dracco, now a division of appellee Fuller Company, began to market its pneumatic conveyors for conveyance of raw polyethylene.

Fuller's assignor, George Schneider, to whom the patent was issued, prior to his retirement in 1965, spent forty years as an engineer in the pneumatic conveying field with Dracco. Pneumatic conveyors, as such, are not new devices. This mechanism is, broadly speaking, an apparatus comprising a tube or conduit, a blower, a feeder, and a receiver. Air is forced through the conduit by the blower at a velocity sufficiently high to prevent the conveyed material from settling inside the conduit when fed into the airstream. Prior to 1955 cast-iron pipe, black iron or steel pipe, stainless steel pipe, or aluminum pipe were used in pneumatic conveyor systems as conduit. Stainless steel and aluminum were preferable in the polyethylene industry since steel and cast iron tended to contaminate the end product.

By 1955 a great problem faced the industry of pneumatic conveyors of polyethylene. Companies using pneumatic conveyors were experiencing a problem called "skinning" or streamer formation. Polyethylene pellets tended to slide along the smooth walls of the conduits. This sliding, coupled with the frictional heat created thereby, tended to coat the conduit walls with polyethylene. This coating would eventually dislodge in the form of long streamers. These streamers would ball up and foul the conveying equipment and interfere with the eventual molding of polyethylene products.

The evidence showed that Monsanto Chemical Company had spent large sums and the time of many experts in an attempt to solve the streamer problem. One of Fuller's customers was having much trouble with streamers and demanded that Fuller solve the problem or lose a prospective sale of systems to be used in the company's new plant. Against this background Mr. Schneider went to work on the problem. The trend of the industry had been to try to avoid skinning by making smoother conduit. Mr. Schneider went the opposite way and discovered that streamer formation was avoided by roughening the inner walls of the pipe. The roughened walls prevented streamer formation by reason of the creation of an "abruptly descending velocity gradient" in the airstream adjacent to the walls. Stated differently, this caused the air close to the conduit walls to move more slowly than the air in the center and thus frictional contact

---

1. The defense based on the contention that the claims failed to meet the definiteness in description requirement of 35 U.S.C.A. § 112, was abandoned in the briefing process and this is also true as to the question, if any, of a defense based on obviousness under 35 U.S.C.A. § 103.

with the walls was minimized. The other effect of the roughening process was that particles tended to bounce off the small peaks or "rugae" which create the roughness rather than to slide along the walls.

The patent described two types of conduit wall. The first is lined with closely spaced annular rings. There is no contention that appellant had produced conveyors of this type. The second type of conduit wall is specified in pertinent part as follows:

"Here the conduit surface is roughened, as by sand blasting, etching or anodizing, to a sandy finish comprising innumerable small peaks or rugae * * *"

The invention claimed, then, is a low pressure pneumatic conveyor with:

" * * * means associated with the walls of said conduit for maintaining an abruptly descending velocity gradient between the main body of said air stream and the walls of said conduit and for interfering with continuous sliding surface contact of said particles with said side walls, said last named means comprising a multiplicity of rugae distributed randomly on the walls of said conduit * * *" [2]

Metal Arts has sold more than 40 conveyor systems since 1963 utilizing sandblasted conduits. These systems were sold in unassembled component form.

## II.

The claims in issue are for an apparatus and not a method. They go to a combination. We proceed to the contention that the claims are invalid because they simply describe a new use of an old apparatus or combination. This assignment of error must be considered in the light of certain established principles of patent law. First, 35 U.S.C.A. § 102 proscribes the issuance of a patent where the invention was anticipated by knowledge of or use of others or had been theretofore patented. This type of invalidity is sometimes termed "lack of novelty". The invention must exhibit utility and novelty. Graham v. John Deere Co., 1966, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545. There is no contention that the invention is lacking in utility. Cf. Anthony v. Ranco, Inc., 5 Cir., 1963, 316 F.2d 509.

Second, patent validity is a question of law to be decided on the basis of factual inquiries. Graham v. John Deere Co., supra; Up-Right, Inc. v. Safway Products, Inc., 5 Cir., 1966, 364 F.2d 580; Sisko v. Southern Resin & Fiberglass Corporation, 5 Cir., 1967, 373 F.2d 866. In *Graham* the court noted several preliminary factual inquiries which are pertinent in determining validity in the face of a defense based on obviousness but the principle is equally applicable to a defense involving lack of novelty. Two of these are the scope and content of the prior art and the difference between the prior art and the claims in issue. The conclusionary inquiry then is to determine the question of novelty *vel non* on the basis of the preliminary findings. The clearly erroneous rule applies in such cases. Hughes Tool Company v. Varel Mfg. Company, 5 Cir., 1964, 336 F.2d 61. But it is to be noted that the rule does not apply in full force to an ultimate factual conclusion. Cf. Industrial Instrument Corporation v. Foxboro Company, 5 Cir., 1962, 307 F.2d 783, footnote 2. Moreover, when prior public use is alleged, the proof "must be clear, satisfactory, and, by some it is said beyond a reasonable doubt * * *" See Southern Implement Mfg. Co. v. McLemore, 5 Cir., 1965, 350 F.2d 244; citing Coffin v. Ogden, 1874, 18 Wall. 120, 85 U.S. 120, 21 L.Ed. 821; and Inglett & Company v. Everglades Fertilizer Company, 5 Cir., 1958, 255 F.2d 342, 346.

A patent awarded by the patent office is presumed valid and the burden is on the party asserting invalidity. 35 U.S.C.A. § 282. Primary responsibility for sifting out unpatentable material lies in the patent office. See *Graham,*

---

**2.** Claim 2 differs from claim 1 only in that it is directed, in addition to polyethylene, to "other material having the property of skinning."

supra, at 383 U.S. 18, 86 S.Ct. 684. It is true that if pertinent references were not considered by the patent office, then this presumption may be diluted or even extinguished. Rosaire v. Baroid Sales Division, National Lead Company, 5 Cir., 1955, 218 F.2d 72, 75. The relevant inquiry, however, since references other than those cited by the patent office may usually be found, is whether these new references raised in the District Court are of such significance that the presumption of validity is affected. This may be done by comparing the references brought up in the District Court to those cited in the patent office. See Otto v. Koppers Company, 4 Cir., 1957, 246 F.2d 789,801. Therefore to determine whether the patent in suit is entitled to the presumption of validity, we must inquire into the similarity between the references used by the patent office, i. e., one German patent, and the references raised at the trial, mainly the Toulmin patent, U. S. Letters Patent No. 245,584. We conclude that the Toulmin patent is the most pertinent prior art but that the presumption is not overcome and thus the burden to show invalidity continued to rest on Metal Arts.

Appellant argues that the device of the patent in suit was anticipated by the prior art in four instances: The Toulmin patent; prior pneumatic conveyors employing conduit in conveyor systems of black iron [steel] pipe, cast-iron pipe, and galvanized gutter downspout. With respect to the latter three systems, it is argued that the walls of the conduit were rough and thus in the form of rugae. It follows, so the argument goes, that Schneider has merely developed a new use for an old device.

This argument rests on the idea that any inherent roughness in the conduit is to be equated to the rugae process of the patent. The patent, however, specifies that the conduit surface is to be " * * * roughened, as by sandblasting, etching or anodizing, to a sandy finish comprising innumerable small peaks of rugae * * * " The specification goes on to state that "Contact between the particles * * * and conduit occurs only at the peaks * * * the valley between those peaks being shielded or baffled by the peaks from contact by the particles."

None of these conduit systems anticipates rugae in this degree of specificity. The rugae, if any, was incidental and a happenstance.

The record shows that the cast-iron conduit systems were not used to convey polythylene. Although the interior of the walls of this conduit did obtain some degree of roughness, they were not as rough as sand blasted pipe. In fact this pipe was reamed at the plant to make it smooth. No use was made of a rugae process as such. The mill finish black iron pipe was also used in pneumatic conveyors, but was not used for conveyance of polyethylene because it would inject scale and other impurities into the polyethylene. Again, there was no rugae process as such. The trial court found that the claims of the patent in suit were not anticipated by conduits of these types and we find no error in this conclusion.

The galvanized gutter downspout or pipe is closer to that used in the device of the patent but appellant has not shown by clear evidence that it performs the same function. No rugae process was employed. The evidence is not clear that the galvanized pipe was in use prior to Schneider's patent. The evidence showed that in 1958 some galvanized pipe used by Monsanto did not experience streamer formation. However, there is no proof that this pipe was in use prior to the patent application. The facts were that these pipes were cleaned so often that streamers may not have had time to form in them and, in any event, the molding machines were such at this plant that streamers would have melted in that process and would not have appeared. Finally, it is noteworthy that this machine conveyed sharp edged polyethylene scrap rather than pellets. The sharp edged material tended to scour the pipe wall rather than slide along them as is the case with pellets. The trial court

specifically found that evidence on this point had been unclear and confusing as to the type of conduit used and whether streamers formed. Thus the trial court found that the appellant failed to establish prior use in this regard and we agree.

The last facet of the anticipation or lack of novelty defense rests on the Toulmin patent, issued in 1881. That patent described a "fan blower apparatus for cleaning, scouring, and elevating grain." However, there are significant differences between the Toulmin device and the device of the patent. The Toulmin patent employs two different conduits; one for conveying grain and the other for cleaning grain. The conduit for elevating or conveying grain is not described as roughened in any way. The cleaning conduit described in the patent can be made in the form of a closed loop and is lined with "stone, natural or artificial, pieces of solid emery of the proper shape, india rubber, wood covered with a coating of sand or emery." This device is in no way connected with or intended to cure the problem of streamer formation which was unknown at the time. The roughened part would be intolerable for polyethylene conveyance as described in the Toulmin patent because the linings mentioned would inject impurities into the airstream. In fact, Toulmin's apparatus was aimed at a result opposite that of Schneider. The cleaning conduit of Toulmin was intended to scour the edges of the matter in the airstream through contact with the walls. Schneider, however, avoids contact with the walls through the "abruptly descending velocity gradient." The device of Toulmin is a cleaner, when roughened, and not truly a conveyor. The testimony was that streamer formation might be possible in the Toulmin device without any modification.

■■ It is thus clear that Toulmin's device was aimed at a wholly different problem, performed a different function, and could not have been used, without modification, to accomplish the ends sought by Schneider. The trial court rejected Toulmin as being anticipatory prior art. This finding was well founded and not clearly erroneous. It is settled that there is no anticipation constituting lack of novelty where modification is necessary to the prior art in order to accomplish the function of the patent in question. Topliff v. Topliff, 1892, 145 U.S. 156, 161, 12 S.Ct. 825, 827–828, 36 L.Ed. 658; Duo-Flex Corporation v. Building Service Company, 5 Cir., 1963, 322 F.2d 94. We find no error in the conclusion reached by the District Court that the patent in suit was not disclosed by any of the prior art. Utility being undisputed and novelty being established, the finding of validity was not error.

### III.

The trial court found infringement, both direct and contributory, and, in addition, that Metal Arts induced infringement. The conduit in the conveyor systems which were sold in component part form by Metal Arts was stipulated to have been roughened by sandblasting.

■ Metal Arts urges that it cannot be guilty of direct infringement of a combination patent since the component parts were shipped from its plant in unassembled condition, relying on Cold Metals Process Co. v. United Engineering Co., 3 Cir., 1956, 235 F.2d 224. There the court held that the manufacture and sale of parts in this country to be assembled outside the United States does not infringe a combination patent. This is not the case here where there were sales of components to be assembled into an infringing apparatus inside the United States and where Metal Arts aided in the assembly. See Radio Corp. of America v. Andrea, 2 Cir., 1937, 90 F.2d 612; Electric Pipe Line, Inc. v. Fluid Systems, 2 Cir., 1956, 231 F.2d 370. These facts of record make out a case of direct infringement. Contributory infringement was made out by the separate sale of sandblasted conduit. The finding of inducement of infringement is made out by the evidence of supplying its customers with infringing systems or component parts. See 35 U.S.C.A. § 271(b) (c).

**324**

We add one caveat: The stipulation as to sandblasting by Metal Arts and the inference necessarily drawn therefrom by the District Court that the sandblasting resulted in a sandy finish is sufficient to support the finding of infringement. While Metal Arts made no effort to overcome this inference, it is not precluded on remand from showing that its sandblasting produced a different result from that of the patent which is restricted to a sandy finish. This goes to the question of damages, however, and is for the special master in the beginning.

Affirmed.