**KIVA CORPORATION, Plaintiff-Appellee,**

v.

**BAKER OIL TOOLS, INC., Defendant-Appellant.**

**No. 26733.**

United States Court of Appeals
Fifth Circuit.

May 29, 1969.

---

Frank Gibson, Humphrey, Gibson & Darden, Wichita Falls, Tex., Oscar A. Mellin, Carlisle M. Moore, Mellin, Hanscom & Hursh, San Francisco, Cal., for appellant.

Milburn E. Nutt, Nelson, Montgomery & Robertson, Wichita Falls, Tex., Jerry J. Dunlap, Dunlap, Laney, Hessin & Dougherty, Oklahoma City, Okl., for appellee.

Before COLEMAN and GODBOLD, Circuit Judges, and SCOTT, District Judge.

COLEMAN, Circuit Judge:

In the District Court judgment was entered, pursuant to the verdict of a jury, declaring invalid Baker Oil Tool Patents No. 2,799,346 ('346) and No. 2,806,532 ('532) relating to certain oil well tools known as "retrievable bridge plugs". We affirm.

Kiva Corporation, plaintiff below and appellee here, sought a declaratory judgment that the two patents were invalid, or if valid not infringed by Kiva. Baker answered and counterclaimed, asserting that Kiva had, in fact, infringed. At pre-trial Kiva stipulated that if '532 is valid then it had been infringed. The case went to the jury on special inter-

rogatories, with the result above stated. Baker's motions for a judgment notwithstanding the verdict and for a new trial were denied. The appeal followed.

In response to the special interrogatories, the jury found that Patent '532 was in prior public use, was not new, and was obvious. It likewise found that Patent '346 did not disclose an operative device, did not disclose the "best mode", was not new, and was obvious. The jury further determined that Kiva did not infringe '346.

Baker vigorously contends that each and all of the jury findings are clearly erroneous; that the court erred in submitting issues as to obviousness, newness, and infringement to the jury; that the court erred in denying Baker's motion for a directed verdict and a judgment notwithstanding the verdict; and the court particularly erred in refusing to instruct the jury to disregard the testimony of the witness Greenroyd as to prior use of '532.

In Micr-Shield Company v. First National Bank of Miami, 5 Cir., 1968, 404 F.2d 157, 161 cert. denied 394 U.S. 960, 89 S.Ct. 1308, 22 L.Ed.2d 561, this Court defined appellate function in a case of this kind:

"There can be no real dispute between the parties as to the applicable law which controls our decision. For the most recent statement of these principles in this circuit, see Metal Arts Co. v. Fuller Co. (5 Cir., 1968), 389 F.2d 319. As pointed out there, while patent validity is a question of law, it is to be 'decided on the basis of factual inquiries'. Graham v. John Deere Co. (1966) 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545. In Graham, as we pointed out in the Metal Arts Company case, supra, 'the court noted several preliminary factual inquiries which are pertinent in determining validity in the face of the defense based on obviousness, but the principle is equally applicable to a defense involving lack of novelty. Two of these are the scope and content of the prior art and the difference between the prior art and the claims in issue. The conclusionary inquiry then is to determine the question of novelty vel non on the basis of the preliminary findings. The clearly erroneous rule applies in such cases. Hughes Tool Co. v. Varel Mfg. Co., 5 Cir., 1964, 336 F.2d 61'.

"It is also pointed out in the Metal Arts case that a finding of prior public use as a defense must be based on evidence that is 'clear, satisfactory, and by some it is said beyond a reasonable doubt * * *', citing Southern Implement Mfg. Company v. McLemore (5 Cir., 1956) 350 F.2d 244."

Most recently, in a decision dated April 7, 1969, this Court en banc defined the standard for the sufficiency of the evidence in connection with motions for directed verdicts and for judgments notwithstanding the verdict, Boeing Company v. Shipman, 5 Cir., 411 F.2d 365:

"If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses."

I

*The Factual Aspects*

The function of the retrievable drill plug may be illustrated in the following manner: An oil well may descend through several oil producing zones. The thickness of each zone and the spacing between zones varies according to the particular geological formations which may be encountered and drilled. To extract oil from each zone a hollow casing is placed into the drill hole and cemented into place. This casing at each zone is then perforated so as to open holes into the formation from which the oil is sought to be recovered.

Many formations contain rock, sand or other materials which prevent the flow of oil into the casing. To stimulate the flow into the casing, the zones or formations are chemically treated. Two common methods are used: (1) *acidizing*, whereby acid is forced through the perforations and into the formations, causing the rocks (usually limestone) to be eaten away and thus increasing the size of the passage for the oil to flow into the casing; and (2) *fracturing*, whereby a fluid is forced through the perforations, building up pressure in the formation, causing it to fracture and open cracks, thus allowing oil to flow into the casing.

Each zone has to be treated independently of all others in order to create a pressure and force the fluid into that particular zone.

Before development of the retrievable bridge plug, a zone was isolated either by use of a permanent bridge plug or a straddle packer.

A. The permanent bridge plug—To seal off a zone using a permanent bridge plug, a plug is run down the well and anchored to the casing at a point below the zone to be treated. This is to prevent the fluid from flowing in the casing above or below the plug. Next, tubing is placed in the casing and a retrievable packer is run on the tubing down the well and above the perforations in the zone which is to be treated. As a conse-

quence, the zone is sealed off from other zones. The fluid is then pumped down the tubing and through the perforations into the zone.

To treat another zone, the retrievable packer is removed from the well, a second permanent bridge plug is inserted below the next zone, and the retrievable packer is again sent down the casing to a point above the zone to be treated. Each zone is similarly treated. The disadvantage of this method is that a permanent bridge plug cannot be retrieved, and to reopen the well, each bridge plug must be drilled out. In addition, it is a time-consuming process to remove the retrievable packers each time a zone is treated.

There are, however, two advantages to the permanent bridge plug system: (1) since the plug and the packer are not physically connected, they may be flexibly fitted to conform to the varying depths of each zone; (2) both the plug and the packer are attached to the casing by toothed slips, permitting a great amount of pressure to be exerted on the casing before the plug will break.

B. The straddle packer—In this instance, two packers, upper and lower, are used. These are physically connected and separated by tubing. As a unit, these packers are run down the casing and positioned so that the packers straddle the perforations in each zone. The advantage to this system is that all zones may be treated without having to remove the packers, and after treatment, the equipment may be recovered.

But like the permanent bridge plug, it has its disadvantages: (1) since there is no way to anchor the packers to the casing, not as much pressure can be built up between the packers; (2) since the packers are physically connected, there is no flexibility to accommodate the varying depths of each zone. To compensate for that, the packers often have to be removed from the well and readjusted.

The *retrievable bridge plug* involved in the questioned patents was developed

by Baker Oil Tools, Inc. as an improvement over *the permanent bridge plug* and *straddle packer* systems. It is essentially composed of a retrievable bridge plug, an upper packer and a releasable connection between them. The packer and plug are attached on the surface and run down into the well together. When they reach the zone to be treated, the retrievable bridge plug is placed below the perforations in that zone and released from the upper packer. When it is released, the plug seals the casing and prevents the flow of fluid past it. The upper packer is then pulled up and located at the upper end of the perforations, thereby sealing the zone at the top and isolating that zone. Fluid is pumped through a tube inserted in the center of the packer and then through perforations. After the zone is treated, the packer is lowered and connected with the bridge plug. Together they are moved upward and the same procedure is repeated with another zone.

The retrievable bridge plug combines all of the advantages of the other methods: all zones may be treated in a single trip up the casing; no plug is left in the casing after treatment; since the packer plug may be connected and disconnected, spacing between the two may be varied to accommodate the varying depths of the zone; and the plug is able to withstand great pressure.

Baker Tools built its first retrievable bridge plug, Model A, in 1953. Due to difficulty with the retrieving mechanism, a second model, Model B, was built. The primary difference in the two models was that "rocker type slips" were incorporated in Model B, making the bridge plug shorter, and presumably aiding the retrieving procedure. Patents on Model A ('346) were applied for on October 16, 1953. Prior to that time, Model B ('532) had been used in fifteen operations. Although fourteen proved successful, there was constant difficulty with the new "rocker slips" and retrieving mechanisms. Changes were made, and Model C, the present Baker commercial model, was developed.

Basically, Model C is similar to the models on which the patents were obtained.

After development of its retrievable bridge plug, Baker Tools entered into licensing agreements with several drilling companies. In fact, about 63,000 Baker plugs have been used.

Totem Oil Tools, Inc. was organized in 1961 by three former employees of Baker Tools, W. R. Lewis, W. W. Farrar and J. R. Lindley. These men possessed considerable knowledge of Baker's bridge plug device. Believing that a market existed for retrievable bridge plugs, they developed one which was eventually patented. Kiva Corporation was incorporated in August, 1963, to handle rentals of the Totem bridge plug.

## II

### Analysis

Probably the most serious aspect of this appeal is Baker's contention that the testimony of Virgil Greenroyd should have been excluded because it lacked sufficient corroboration to support its admissibility.

Greenroyd's testimony was intended to show prior public use of the tools in issue.

We first examine the law on the subject.

The Supreme Court in an opinion by Mr. Justice Brown in 1891 spoke as follows:

"We have now to deal with certain unpatented devices, claimed to be complete anticipations of this patent, the existence and use of which are proven only by oral testimony. In view of the unsatisfactory character of such testimony, arising from the forgetfulness of witnesses, their liability to mistakes, their proneness to recollect things as the party calling them would have them recollect them, aside from the temptation to actual perjury, courts have not only imposed upon defendants the burden of proving such devices, but have required that the

proof shall be clear, satisfactory and beyond a reasonable doubt. Witnesses whose memories are prodded by the eagerness of interested parties to elicit testimony favorable to themselves are not usually to be depended upon for accurate information. The very fact, which courts as well as the public have not failed to recognize, that almost every important patent, from the cotton gin of Whitney to the one under consideration, has been attacked by the testimony of witnesses who imagined they had similar discoveries long before the patentee had claimed to have invented his device, has tended to throw a certain amount of discredit upon all that class of evidence and to demand that it be subjected to the closest scrutiny. Indeed, the frequency with which testimony is tortured, or fabricated outright, to build up the defense of a prior use of the thing patented, goes far to justify the popular impression that the inventor may be treated as the lawful prey of the infringer. The doctrine was laid down by this court in Coffin v. Ogden, 18 Wall. 120, 124, [21 L.Ed. 821] that 'the burden of proof rests upon him,' [the defendant,] and every reasonable doubt should be resolved against him. If the thing were embryotic or inchoate; if it rested in speculation or experiment; if the process pursued for its development had failed to reach the point of consummation it cannot avail to defeat a patent founded upon a discovery or invention which was completed, while in the other case there was only progress, however near that progress may have approximated to the end in view'."

The Barbed Wire Patent, 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154.

This case [and others] caused the Fifth Circuit to hold in 1949 that "prior use must be proved beyond a reasonable doubt, and that as a practical matter, it may be said that oral testimony alone, unsupported by writings, has not been and will not be accepted as sufficient", Zachos v. Sherwin-Williams Company,

177 F.2d 762, 763. See also Metal Arts Company v. Fuller Company, 5 Cir., 1968, 389 F.2d 319, and Micr-Shield Company v. First National Bank of Miami, supra.

By agreement of the parties, after the motion to exclude Greenroyd's testimony had been overruled, the Court instructed the jury as follows:

"Here Kiva has the burden of coming forward with clear and convincing evidence to establish that the patents in suit are not valid. This is so, because the law gives the holder of a patent the benefit of a presumption that the patent is valid. In other words, the law presumes, in the absence of clear and convincing evidence to the contrary, that the Patent Office correctly issued the patent.

"By the term 'clear and convincing evidence' is meant that degree of proof which is more than a mere preponderance of the evidence. It is evidence that will produce in your mind a firm belief or conviction as to the truth of the allegations sought to be established."

█ It is axiomatic that instructions agreed to below cannot be complained of here, but the appellant preserved its point as to "oral testimony alone" by its motion to exclude, which was overruled. Was Greenroyd's testimony "supported by writings" as required by *Zachos*, supra? We believe it was.

Greenroyd worked for Steel Special Tools from 1948 to 1954, operating selective treating tools. He testified that during this time he ran retrievable bridge plugs, combination straddle tools, squeeze cement tools, straight straddle tools, and single packers in acidizing and fracturing oil well formations.

These exhibits of Steel Special Tools were introduced at the trial. Greenroyd identified them as a retrievable bridge plug, an upper packer, and a circulating valve. He testified that he used identical tools on July 18, 1950, in the same manner as that of Patent '532. A job

ticket was introduced to show that Greenroyd did in fact perform a hydrofac job on that date. There was another ticket signed by him for a job done on August 4, 1951. There was another for April 27, 1953, which Greenroyd did not sign but it bore the signature of his employer. There was another for December 12, 1950. Greenroyd recalled and testified to the circumstances surrounding the use of the tool, the location of the wells, and the approximate times of day when he began or finished the jobs. He named some of those present at the time.

Baker says that this testimony was insufficient and should have been excluded from the consideration of the jury because the written job tickets did not describe the tool used. Therefore, the jury finding of prior public use is clearly erroneous as not being supported by the necessary documentary corroboration. In other words, Baker seeks to invoke the "supported by writings" rule laid down by Zachos v. Sherwin-Williams Company, supra.

In response, we note that so far as this record shows Greenroyd was a disinterested witness. He was not imagining that he invented the tools. His testimony was neither contradicted nor impeached. Indeed, it was not disputed. His testimony is not improbable on its face. There is nothing to indicate that he was a perjurer. The jury believed his testimony. Therefore, we believe the job tickets as so identified were "writings" in compliance with Zachos, supra. See Whiteman v. Mathews, 9 Cir., 1954, 216 F.2d 712, 716.

## II

■ Appellant asserts that the question of the "obviousness" of the '532 claim was properly one for the court and not the jury. Although there has been much dispute concerning whether the question of "obvious" is one of fact or of law, it has now been established in this Circuit that it is a question of law, Swofford v. B & W, Inc., 5 Cir., 1968,

395 F.2d 362, and thus fully reviewable on appeal.

The court below instructed the jury that, as a matter of law, a patent could not be obtained if the differences between the subject matter sought to be patented and the prior art "would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains". Later, however, the court submitted the question of the obviousness of '532 to the jury in Special Issue No. 10. Baker moved for a judgment notwithstanding the verdict on the ground that Special Issue No. 10 was a conclusion of law. The motion was overruled.

■ Since the court had the opportunity to rule on the question of whether the issue should have been submitted to the jury, on review the appellate court is not bound by the clearly erroneous standard.

■ To prove that '532 was obvious, Kiva again relied on the testimony of Greenroyd, who stated that he had used a retrievable bridge plug in the early nineteen fifties. The jury found this as a primary fact. We, therefore, decide the ultimate fact as did the court below when it denied a judgment notwithstanding the verdict.

## III

In order for a patent to be valid, the patented device must be "new". 35 U.S.C. § 101. The jury found that the claims in issue in '532 were not "new". Appellant attacks that finding. Novelty does not exist under the patent laws

"* * * if patented device has been anticipated by a prior device, whether patented or not; that is, novelty is lacking if all the elements of the patent, or their equivalents are found in a single prior art structure where they do substantially the same work in the same way."

A. J. Industries, Inc. v. Dayton Steel Foundry Company, 6 Cir., 1968, 394 F.2d 357. However, the device need not be

"broadly or generically new. It is sufficient if its novelty is but an improvement on a prior patent". Murray Company of Texas, Inc. v. Continental Gin Company, 5 Cir., 1959, 264 F.2d 65, 69.

Since the only arguably novel idea in Baker's bridge plug was the fact that it was retrievable, the question then becomes whether earlier bridge plugs were retrievable. Again the burden is on the party attacking the patent to prove by clear and convincing evidence that it is not "new". 35 U.S.C. § 282; King-Seeley Thermos Company v. Refrigerated Dispensers, Inc., 10 Cir., 1965, 354 F.2d 533.

Again, if the jury believed Greenroyd's testimony, and the verdict shows that it did, we must apply the *Boeing* standard and, applying it, leave the verdict undisturbed. We agree with what the Ninth Circuit said in Whiteman v. Mathews, supra, to the effect that the trial court is not required to discard credible testimony because it is oral and because it deals with events and circumstances long past. If the evidence is such that it would be accepted as satisfactory and convincing as to any other issue then it must be accorded the same status on the question of newness in a patent case.

### IV

We have critically examined the record and briefs as to the verdicts on Patent '346. Baker submits that some of them are in irreconcilable conflict but we do not find them so. Fundamentally, the issues are factual. We have applied the *Boeing* test and we are entirely convinced that these verdicts are supported by substantial evidence in the record as a whole. The same is to be said of the verdict as to lack of infringement. We therefore refrain from a protracted factual evaluation in this opinion which, in our view, could contribute nothing of importance to the existing law.

The Judgment of the District Court is Affirmed.